# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MICHAEL EDGE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

TUPPERWARE BRANDS CORPORATION, MIGUEL FERNANDEZ, and CASSANDRA HARRIS,

Defendants.

Case No. 6:22-cv-1518-RBD-LHP

## JOINT NOTICE OF THE PARTIES PURSUANT TO SEPTEMBER 23, 2024 MINUTE ENTRY

Lead Plaintiffs Ralph Estep and Michael Dennehy and Plaintiff Michael Edge (collectively, "Plaintiffs") and Defendants Tupperware Brands Corporation, Miguel Fernandez, and Cassandra Harris (collectively, "Defendants" and with Plaintiffs, the "Parties"), hereby jointly submit the following statement pursuant to the Court's September 23, 2024 Minute Entry requesting the Parties' positions on "whether the case can and should proceed against Fernandez and Harris while the bankruptcy stay is in place." (Dkt. 132.)

The Parties agree that this case is automatically stayed as to Tupperware Brands Corporation ("Tupperware"), the debtor in the bankruptcy proceedings. *See* 11 U.S.C. § 362(a)(1). The Parties disagree, however, regarding whether the matter should

remain stayed as to Mr. Fernandez and Ms. Harris (the "Individual Defendants"). Moreover, Defendants represent that their position as to any stay may be impacted by a hearing currently scheduled to take place in the bankruptcy court on October 17, 2024. Therefore, notwithstanding the Parties' disagreement, they have conferred and Plaintiffs have agreed to a brief extension of this Court's temporary stay until after the October 17th hearing in the event that it may provide more clarity on issues germane to Defendants' position regarding this dispute. The Parties thus jointly request that the Court extend their time to provide a joint statement on the issue of whether the case should be stayed as to the Individual Defendants until October 25, 2024.

*Defendants' Statement Regarding the Pending Bankruptcy Proceedings*: On September 17, 2024, Tupperware commenced a bankruptcy case in the United States Bankruptcy Court for the District of Delaware by filing a voluntary petition for chapter 11 relief. Shortly thereafter, a group of Tupperware's creditors moved in the bankruptcy court to, among other options, convert the chapter 11 case to a proceeding under chapter 7 of the bankruptcy code or to dismiss it. (*See* Ad Hoc Group's Motion to Convert, Dismiss, or Lift Stay attached hereto as Exhibit A.) A hearing on the creditors' motion is currently scheduled for Thursday, October 17th. The adjudication of this motion will have substantial impact on the trajectory of the bankruptcy proceedings.

Additionally, further proceedings in the bankruptcy court are necessary to establish that proceeds from relevant directors' and officers' liability insurance policies may be used to indemnify the Individual Defendants in this matter. At all relevant

2

times, Tupperware's bylaws have provided that all persons involved in any action, suit, or proceeding by reason of the fact that they were a director, officer, or employee of Tupperware "shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the [Delaware General Corporation Law] . . . against all expense, liability and loss." Tupperware obtained directors' and officers' liability insurance to, *inter alia*, protect the Company and its directors and officers.[1] In general, the insurance policies cover losses that the Company or its directors and officers incur on account of claims made against them during the policy period, including through advancement of defense costs associated with any such claims. In order for the Individual Defendants to access the proceeds of these insurance policies to defend against the claims in this matter, appropriate relief must be sought in the bankruptcy court upon notice to all affected parties and an opportunity to object. Such a request is unlikely to be addressed prior to the resolution of the motion to convert, dismiss, or lift the stay.

\* \* \*

In light of the foregoing, the Parties respectfully request that the Court extend their time to submit a joint notice concerning whether the stay should continue as to the Individual Defendants until October 25, 2024.

---

[1] Tupperware is not permitted to make any payments to indemnify or advance defense costs of the Individual Defendants while the automatic stay remains in place without further authorization of the bankruptcy court.

3

Dated: October 7, 2024

Respectfully submitted,

By: */s/ Michael Wernke*
Jeremy A. Lieberman*
Michael Wernke*
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mjwernke@pomlaw.com

Shannon L. Hopkins*
Gregory M. Potrepka*
Morgan M. Embleton*
P. Cole von Richthofen*
**LEVI & KORSINSKY, LLP**
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (212) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: membleton@zlk.com
Email: cvrichthofen@zlk.com

*Co-Lead Counsel for Plaintiffs and the Class*

Cullin Avram O'Brien
**CULLIN O'BRIEN LAW, P.A.**
6541 NE 21st Way
Ft. Lauderdale, FL 33308
Tel: (561) 676-6370
Email: cullin@cullinobrienlaw.com

*Liaison Counsel for Plaintiffs and the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165

4

Tel.: (212) 667-6484
Fax: (212) 667-7296
Email: peretz@bgandg.com

*Additional Counsel for Plaintiff Ralph Estep*

**THE PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East Suite 600
Los Angeles, CA 90067
Tel.: (310) 6928883
Email: lesley@portnoylaw.com

*Additional Counsel for Michael Edge*

*\*pro hac vice* forthcoming or submitted

*/s/ Ian M. Ross*
Ian M. Ross (Bar No. 091214)
**SIDLEY AUSTIN LLP**
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131
Telephone: (305) 391-5100
Email: iross@sidley.com

James W. Ducayet (IL Bar No. 6236997)
Jennifer M. Wheeler (IL Bar No. 6316898)
Abigail Bachrach (IL Bar No. 6337057)
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Email: jducayet@sidley.com

jwheeler@sidley.com
abachrach@sidley.com

*Counsel for Defendants*

5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2024, I electronically filed the foregoing document using the CM/ECF system, which will send notice of this filing to all counsel of record.

<u>/s/ Ian M. Ross</u><br>Ian M. Ross

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>TUPPERWARE BRANDS CORPORATION, *et al.*,[1]<br><br>                  Debtors. | Chapter 11<br><br>Case No. 24-12156 (BLS)<br><br>(Joint Administration Requested)<br><br>**Hearing Date: TBD**<br>**Objection Deadline: TBD** |

**MOTION OF AD HOC GROUP OF SECURED LENDERS FOR AN ORDER
(I) DISMISSING THESE CHAPTER 11 CASES OR CONVERTING THEM TO
CHAPTER 7 OR (II) FOR RELIEF FROM THE AUTOMATIC STAY**

The Ad Hoc Group of Secured Lenders (the "Ad Hoc Group") under the Debtors' prepetition credit agreement dated as of November 23, 2021 (as amended, restated, supplemented, or otherwise modified prior to the date hereof, the "Revolving/Term Loan Credit Agreement") and that certain bridge loan credit agreement dated as of August 12, 2024 (as amended or otherwise modified from time to time, the "Bridge Loan Credit Agreement"),[2] by and through its undersigned counsel, hereby submits this motion (this "Motion") seeking an order (i) to dismissing these

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tupperware Brands Corporation (2333); Dart Industries Inc. (5570); Deerfield Land Corporation (0323); Premiere Products Inc. (4064); Tupperware Brands Latin America Holdings, L.L.C. (0264); Tupperware Home Parties LLC (1671); Tupperware International Holdings Corporation (8983); Tupperware Products AG (6765); Tupperware Products, Inc. (8796); and Tupperware U.S., Inc. (2010). The location of the Debtors' service address in these Chapter 11 cases is: 14901 S Orange Blossom Trail, Orlando, FL 32837.

[2] The members of the Ad Hoc Group hold, in the aggregate, approximately $462.65 million, or 57%, of the approximately $817 million principal amount outstanding under the Revolving/Term Loan Credit Agreement. The debt thereunder is secured by a first lien on substantially all the Debtors' assets, including cash collateral, other than certain specified inventory on which the Prepetition Secure Lenders have a second lien. The members of the Ad Hoc Group also hold, in the aggregate, $8 million in principal amount of loans outstanding under the Bridge Loan Credit Agreement, which is secured by a first lien on certain inventory, and the proceeds, products, and offspring thereof.

Chapter 11 cases or converting them to chapter 7 or, in the alternative (ii) granting relief from the automatic stay, and in support thereof, respectfully states as follows: [3]

**PRELIMINARY STATEMENT**

1.      The Court should dismiss these Chapter 11 cases, or convert them to cases under chapter 7, for several reasons.  *First*, the Debtors are hopelessly administratively insolvent. Although the Debtors' have a well-known brand name and product, their sales have been declining for years.  The Debtors have massive fixed overhead costs and an outdated marketing model.  Their operations did not generate positive cash flow outside of Chapter 11 and continue to rapidly decline.  Moreover, the Debtors have no material unencumbered assets on which a DIP loan could be raised, and the Ad Hoc Group (whose members comprise the "Required Lenders" under the Revolving/Term Loan Credit Agreement, and all of the "Lenders" under the Bridge Loan Credit Agreement) does not consent to the Debtors' use of Cash Collateral and will not consent to postpetition financing on a priming basis.  Even if the Court were to authorize the use of Cash Collateral (which, for the reasons set forth in the Cash Collateral Objection, it should not), the Debtors will inevitably run out of cash because they do not, and will not, generate sufficient funds to cover operating expenses, let alone professional fees and other administrative expenses.

2.      *Second*, while the administrative costs of the bankruptcy can only harm the Prepetition Secured Lenders, there is also no scenario in which these Chapter 11 cases create any value for other stakeholders.  Beginning in April 2023, the Debtors ran an extensive, three-stage marketing process for their assets and businesses.  Although that process generated some non-binding bids—the highest providing for materially less than a 20% recovery on the $817 million

---

[3]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Preliminary Objection of Ad Hoc Group of First Lien Lenders to Debtors' Motion for Authority to Use Cash Collateral* (the "Cash Collateral Objection").

2

in principal amount outstanding under the Prepetition Revolving/Term Loan Credit Agreement—none of those bids resulted in a consummated transaction. Thus, it is irrefutable that the value of the Debtors and the Collateral, which comprises all the Debtors' material assets, is a fraction of the Prepetition Secured Debt. In fact, the Debtors have acknowledged that they "agree[] with the Ad Hoc Group that there are almost certainly insufficient assets available to provide a recovery to general unsecured creditors or shareholders, as definitively demonstrated by the years-long marketing process." *See* First Day Declaration, Exhibit B.

3. Not only did the Ad Hoc Group not ask the Debtors to run a Chapter 11 sale process for their Collateral, they actively opposed it in favor of a consensual out-of-court partial strict foreclosure. The Ad Hoc Group advised the Debtors that there were no benefits to filing a Chapter 11 case, as the Ad Hoc Group was not interested in the assumption and assignment of executory contracts, and there were no second liens to release. The Ad Hoc Group also communicated that—given the low fair market value of the Debtors' assets and business, their negative cash flow, and the high costs of any Chapter 11—the Debtors cannot afford a Chapter 11 case, and the Ad Hoc Group would not fund a Chapter 11 by providing DIP financing or through consent to the use of Cash Collateral. The Ad Hoc Group simply does not believe that the Debtors can afford any time in Chapter 11 while meeting their statutory obligation to provide the Prepetition Secured Lenders with adequate protection.

4. The Ad Hoc Group gave the Debtors every opportunity to affect a transfer of Collateral outside of the bankruptcy process, and the Ad Hoc Group continues to believe the Chapter 11 process provides no benefit to any stakeholders. Upon information and belief, since January 2023, the Company has spent approximately $67 million on restructuring advisors' fees and expenses without a successful turnaround or sale of the business. The Ad Hoc Group does not

believe that the additional expense of a Chapter 11 process will yield any better results, and will only serve to further erode the value of their Collateral. The Debtors should not be allowed to run a non-consensual sale process that deprives the Prepetition Secured Lenders of their credit bid rights just to use the Prepetition Secured Lenders' Collateral to pay their own professionals and seek releases for their directors and officers.

5. *Third*, the Debtors have no prospect of a successful reorganization in Chapter 11. Confirming a Chapter 11 plan would require the both the affirmative vote of the Prepetition Secured Lenders and the payment in full of all administrative claims (including the Prepetition Secured Lenders' claims under section 507(b) for inadequate adequate protection), both of which would require the Ad Hoc Group's consent. That consent is not forthcoming.

6. *Fourth*, given the protracted, failed sale process that produced no actionable bids, the Debtors have little to no chance of receiving any third-party bids on the Collateral of a value remotely acceptable to the Prepetition Secured Lenders, and no chance of receiving any bids that exceed the Prepetition Secured Debt. If the Court were to allow this process to continue, the Debtors are likely to completely run out of cash and deplete the value of the Collateral, and thus be forced to convert these cases to Chapter 7 anyway. The Court should immediately dismiss these Chapter 11 cases, or in the alternative, convert the cases to chapter 7, to stem the tide of value destruction that has already and will continue to occur as long as these Chapter 11 cases proceed.

7. In the event the Court declines to dismiss or convert the cases, the Ad Hoc Group strongly urges the Court, in the alternative, to grant relief from the automatic stay because the

4

Prepetition Secured Lenders are not, and cannot be, adequately protected against diminution of their Collateral.[4]

8.        The Ad Hoc Group stresses that, although it seeks dismissal or conversion, it does not, as the Debtors assert, wish to "shut down the business," and never has.  *See* First Day Declaration, ¶ 16.  In fact, the Ad Hoc Group funded two tranches of bridge financing and dedicated enormous time and resources to working collaboratively with management to develop a path forward that would preserve thousands of jobs and an iconic American brand through an out-of-court strict foreclosure transaction.  After the Debtors and their advisors spent nearly two years and tens of millions of dollars attempting to find a restructuring solution, they decided to forego the Ad Hoc Group's actionable and reasonable proposal, which would have provided sufficient funding to continue certain of the Debtors' operations and preserve thousands of jobs.  Instead, the Debtors chose an extremely contentious path, seeking to use Cash Collateral on a non-consensual basis to fund, among other things, a 363 sale process that deprives the Prepetition Secured Lenders of their statutory right to credit bid.

9.        The Ad Hoc Group was willing to invest new money in the Debtors, but preferred to direct their investments into a reorganized business rather than to fund administrative bankruptcy costs.  That does not equate to a desire to "shut down the business," and, given that much of the Debtors' businesses are conducted by non-debtor foreign subsidiaries, the Ad Hoc Group remains hopeful that certain such businesses can continue operations even if the Chapter 11 cases are converted to Chapter 7.

---

[4]    The Ad Hoc Group requests adequate protection under sections 361 and 362(d)(1) of the Bankruptcy Code, and reserves the right to assert an administrative expense claim under section 507(b) of the Bankruptcy Code for inadequate adequate protection.

5

**JURISDICTION & VENUE**

10.     The district court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, as a core matter "arising under" title 11 of the United States Code (the "Bankruptcy Code"). This proceeding has been referred to the United Sates Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. §157(a) and the *Amended Standing Order of Reference* (Sleet, C.J.), dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

11.     Pursuant to Local Rule 9013-1(f), the Ad Hoc Group consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested by this Motion are sections 105, 362, and 1112 of the Bankruptcy Code, rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 9013-1 of the Bankruptcy Local Rules for the District of Delaware (the "Bankruptcy Local Rules").

**BACKGROUND**

13.     Pursuant to the prepetition Revolving/Term Loan Credit Agreement and related documents, the Prepetition Secured Lenders, including the members of the Ad Hoc Group, have valid, perfected liens on substantially all of the Debtors' assets, including Cash Collateral. The Debtors have been in default under the Revolving/Term Loan Credit Agreement since at least February 2024.

14.     In March 2020, the Debtors retained Moelis & Company ("Moelis") as investment bankers and, since April 2023, the Debtors and Moelis have attempted to market the Debtors' assets and business to a potential buyer. After an extensive search, however, the Debtors were

unable to solicit a successful bid. In fact, the highest bid received by Moelis accounted for much less than 20% of the debt outstanding under the Revolving/Term Loan Credit Agreement. This unsuccessful marketing campaign demonstrates that the value of the Collateral is significantly lower than the outstanding amount of the secured debt owed.

15.    Despite these low values, the Ad Hoc Group was interested in exploring a potential agreement that would allow the certain of the Debtors' businesses to continue to operate. Pursuant to the Bridge Loan Credit Agreement, the members of the Ad Hoc Group provided $8 million in bridge financing to give the Debtors additional runway and reach consensus on a restructuring transaction. The Ad Hoc Group spent considerable time and effort prepetition working collaboratively with the Debtors' management to develop a path forward, and the Ad Hoc Group's members believed that they and management identified a strategy that would allow the Debtors to operate as a new, well-capitalized company in multiple key markets.

16.    In the Ad Hoc Group's view, however, a Chapter 11 case would be prohibitively expensive, destroy going concern value, and not benefit any stakeholders. Thus, the Ad Hoc Group proposed that the Debtors transfer certain Collateral to a newly formed entity ("NewCo") owned by the Prepetition Secured Lenders through an out-of-court strict foreclosure under the Uniform Commercial Code (the "UCC"), specifically Article 9 sections 9-619, 9-620, 9-621, and 9-622, in partial satisfaction of debt in an amount greater than the value of the collateral. The strict foreclosure plan was designed to allow for the Debtors' continued operation of their brand, maintain the confidence of their customers and vendors, and preserve thousands of jobs globally, in a cost-efficient and practical manner that recognized the economic realities of the Debtors' circumstances. In connection with this proposal, the Ad Hoc Group expressed willingness to assist with financing, on terms acceptable to the Prepetition Secured Lenders, for a post-strict foreclosure

7

Chapter 11 case that would have provided funding sufficient to cover administrative costs and for the orderly winddown of the Debtors' remaining assets.

17.     The Ad Hoc Group attempted to convince the Debtors that its proposal was best for all stakeholders through numerous discussions with principals and advisors, including in a presentation to the Debtors' board of directors (the "Board") on September 12, 2024. Although— after years of expensive, failed restructuring efforts—the strict foreclosure proposal represented the only executable option available to the Debtors providing for a portion of their businesses to survive as a going concern, the Board refused to consent to the Ad Hoc Group's proposal. The Board's stated rationale is that it desired more transparency and opportunities for parties to object in advance of the transfer of Collateral, even though the Ad Hoc Group proposed to comply with the UCC to effectuate a long-established statutory process with clearly-defined notice procedures.

18.     Despite the clear cost-saving benefits of the Ad Hoc Group's proposals, the Debtors filed for Chapter 11 on September 17, 2024, over the Ad Hoc Group's strenuous objections and without funding. The Debtors continue to offer no clear explanation regarding their choice to pursue a path that involves significantly increased costs and risk of value destruction. The Ad Hoc Group does not consent to the use of Cash Collateral and does not and will not agree to pay the costs of administration of the Chapter 11 cases.

## OBJECTION

### A. The Court Should Dismiss the Chapter 11 Cases or Convert them to Chapter 7.

19.     Section 1112(b)(1) of the Bankruptcy Code provides that the court shall dismiss a Chapter 11 case or convert the case to chapter 7 for "cause" when it is in the "best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1); *In re Team Sys. Int'l LLC*, 640 B.R. 296, 310 (Bankr. D. Del. 2022).

20.     Though "cause" is not defined in the Bankruptcy Code, section 1112(b)(4) provides a non-exhaustive list of "causes" for conversion or dismissal, including where there is "substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).  Continued loss exists where a debtor "has continued to experience a negative cash flow." *In re AIG Fin. Prods. Corp.*, 651 B.R. 463, 475 (Bankr. D. Del. 2023).  Cause may also be found when a debtor's losses are "sufficiently large under the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interests of creditors." 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a][i] (2024).  The absence of a reasonable likelihood of rehabilitation can be proven by the "administrative insolven[cy] of the Debtor's estate." *In re Grasso*, 497 B.R. 448, 456 (Bankr. E.D. Pa. 2013).  Conversion is appropriate where there is uncertainty regarding whether a debtor will be able to propose a confirmable plan and negative cash flow will continue indefinitely if the case remains in Chapter 11.  *See In re Alston*, 756 Fed. Appx. 160, 164 (3d Cir. 2019) (citing *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 517-18 (8th Cir. 2004)).

21.     Where, as is the case here, "virtually all of the indebtedness runs to secured creditors, and there is no equity in the property which would benefit unsecured creditors, the invocation of Chapter 11 is an abuse of Bankruptcy Court's jurisdiction." *In re FJD, Inc.*, 24 B.R. 138, 141 (Bankr. D. Nev. 1982).  Moreover, courts have dismissed Chapter 11 filings that arise primarily from a dispute between a debtor and its secured creditors.  *See, e.g., In re Stream TV Networks, Inc.*, No. 21-10848 (KBO), 2021 WL 2711982, at *5 (D. Del. July 1, 2021) (courts may dismiss bankruptcy filings that are "in essence a two-party dispute capable of resolution in another forum"); *In re Y.J. Sons & Co., Inc.*, 212 B.R. 793, 802 (D. N.J. 1997) (same).

22. The Debtors' failed marketing process highlights that the Prepetition Secured Debt is significantly undercollateralized, and the Debtors will incur continuous and substantial losses during these Chapter 11 cases. Based on the Debtors' own projected budget, they anticipate a 30% drop in collections, which will therefore not even cover the cost of operations. In fact, a review of the budgets filed with the Cash Collateral Motion confirms that, in both the United States and Switzerland, total receipts are projected to be materially lower than total disbursements, cash on hand is projected to decline by $3 million, and the Debtors project to operate at a $4 million cash flow deficiency, in each case before payment of any professional fees. *See* Cash Collateral Motion Ex. 1. Further, the Debtors can only pay the estates' professional fees, which are likely to be substantial, through a carve-out from Collateral that the Ad Hoc Group opposes. The Ad Hoc Group does not consent to the Chapter 11 cases or the proposed sale process, and thus should not be penalized by the effective surcharge of its Collateral. Thus, the estates are both operationally and administratively insolvent.

23. Moreover, the Debtors have no reasonable prospect of rehabilitation. The Debtors cannot propose a confirmable Chapter 11 plan because the Ad Hoc Group will not vote in favor of one, and the Debtors will not have resources to pay administrative expense claims. Accordingly, dismissal of these Chapter 11 cases or conversion to chapter 7 so that the Prepetition Secured Lenders can efficiently obtain the benefit of their Collateral in the most cost-effective manner possible is the only path forward.

24. There is no justifiable reason for the Debtors to proceed with these Chapter 11 cases. In light of the administrative costs and the lack of any value beyond the Prepetition Secured Debt, none of the Debtors' secured or unsecured creditors benefit from the filing. And without the

10

Prepetition Secured Lenders' consent, there is no chance of a successful outcome to these Chapter 11 cases.

26.    The core dispute here is more properly suited for an out-of-court resolution.  The Ad Hoc Group proposed such a resolution in the form of the strict foreclosure process, which was rejected.  The only workable path left is an out-of-court non-consensual foreclosure, or a turnover of Collateral to the Prepetition Secured Lenders in a chapter 7.  Given that much of the Debtors' businesses are conducted through foreign subsidiaries that are not Debtors in these Chapter 11 cases, the Ad Hoc Group is hopeful that some of those businesses, and associated jobs, vendor, and customer relations can be preserved as going concerns, even if the Chapter 11 cases for the Debtors are dismissed or converted.

**B.  Cause Exists for Relief from the Automatic Stay under Section 362(d)(1) Because the Ad Hoc Group Lacks Adequate Protection in the Collateral.**

26.    Under Section 362(d) of the Bankruptcy Code, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the automatic stay . . . such as by terminating, annulling, modifying, or conditioning such stay . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; (2) with respect to a stay of an act against property under subsection (a) of this section, if (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization . . .." 11 U.S.C. § 362(d)(1)-(2).  Each subsection in section 362(d) is an independent ground for granting relief from the automatic stay.  *See Nazareth Nat. Bank v. Trina-Dee, Inc.*, 731 F.2d 170, 171 (3d Cir. 1984) ("Only in cases where the court finds an equity in the debtor, or where the court finds that the property is necessary to an effective reorganization, is it necessary to consider the first ground for relief from the stay—the adequacy of protection of the secured party seeking relief.");

11

*Matter of 1025 Assocs., Inc.*, 106 B.R. 805, 811 (Bankr. D. Del. 1989 ("a ruling under either subsection (d)(1) or (d)(2) is all that is necessary for relief.").

27.      Relief from the automatic stay is mandatory once a court determines that the requirements set forth in either subsection (d)(1) or (d)(2) have been satisfied.  *See* 11 U.S.C. § 362(d) (providing "the court shall grant relief from the stay") (emphasis added); *see also In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 208 (3d Cir. 1995) ("the language of section 362(d)(2) is mandatory, when both factors necessary for relief under section 362(d)(2) are met").

28.      If adequate protection is lacking, the Court *must* grant relief from the stay.  *John Hancock Mut. Lift Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 (3d Cir. 1993) ("Section 362(d)(1)[] *requires* a bankruptcy court to grant relief if the creditor would not otherwise have 'adequate protection' of an interest in the property in question.") (emphasis added); *see also In re Van Horn*, No. 10-07373 (MDF), 2011 WL 1900324, at *3 (Bankr. M.D. Pa. May 19, 2011) ("Under § 362(d)(1), a bankruptcy court is required to grant relief from the stay to a moving party upon a showing of 'cause, including the lack of adequate protection of an interest in property.'").

29.      Under section 362(d)(1), once the Ad Hoc Group makes a *prima facie* showing that the value of the Collateral is less than its secured interest in the property at issue and its value will continue to diminish, the burden shifts to the Debtors to show otherwise, and that they can provide adequate protection to the Ad Hoc Group.  *See Matter of Rexene Prods. Co.*, 141 B.R. 574, 576-77 (Bankr. D. Del. 1992); *see also In re Rocco*, 319 B.R. 411, 419 (Bankr. W.D. Pa. 2005) ("Debtors bear the burden of proof on all issues other than equity."); 11 U.S.C. § 362(g) ("[T]he party requesting [] relief [under § 362(d)] has the burden of proof on the issue of the debtor's equity in property," while any "party opposing such relief has the burden of proof on all other issues.").

12

30. Again, as evidenced by the failed marketing process—by which the highest potential bid accounted for materially less than 20% of the Prepetition Secured Debt—the value of the Collateral is well below the outstanding amount of the Prepetition Secured Debt. Further, if Debtors continue to use Cash Collateral, the value of the Ad Hoc Group's security interest will continue to decrease at a rapid rate as the Debtors project to operate at a material operational cash flow deficiency before payment of professional fees. Accordingly, the Ad Hoc Group has satisfied its *prima facie* burden in proving that they are entitled to adequate protection.

31. Further, for the reasons set forth in the Cash Collateral Objection, the Debtors cannot meet their burden of demonstrating that the Prepetition Secured Creditors are adequately protected. In fact, they have submitted no evidence to attempt to do so.

32. The Ad Hoc Group's interest in the Collateral is not adequately protected, and the Debtors intend to continue depleting the Collateral with no replacement of equivalent value. Accordingly, in the event the Court declines to dismiss or convert the cases, the Court must lift the automatic stay so that the Prepetition Secured Lenders can foreclose on their Collateral.

## **NOTICE**

33. Notice of this Motion will be given to: (i) proposed counsel for the Debtors; (ii) proposed counsel to any Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases; (iii) counsel for Wells Fargo U.S. Bank Trust Company, National Association, in its capacity as Administrative Agent under the Revolving/Term Loan Credit Agreement; (iv) counsel for GLAS USA, LLC, as Administrative Agent under the Bridge Loan Credit Agreement; (v) counsel for GLAS Americas LLC, in its capacity as Collateral Agent under the Bridge Loan Credit Agreement; (vi) the Office of the United States Trustee for the District of Delaware; (vii) the parties that, as of the filing of this Motion, are listed on the consolidated list of creditors filed by

13

the Debtors in these Chapter 11 Cases; and (viii) any other party that, as of the filing of this Motion, has requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002. Under the specific facts and circumstances of these Chapter 11 Cases, the Ad Hoc Group submits that no other or further notice of this Motion should be required.

## NO PRIOR REQUEST

34.     No prior request for the relief sought herein has been made by the Ad Hoc Group to this or any other court.

## CONCLUSION

35.     The Debtors' proposed course of action provides no discernible path to a value-maximizing transaction and offers no meaningful contribution to any of their stakeholders beyond their Prepetition Secured Lenders.  As such, the Chapter 11 cases should be dismissed or converted to a chapter 7 liquidation or, in the alternative, the Court should grant relief from the automatic stay.

Dated: September 19, 2024

*/s/ Robert F. Poppiti, Jr.*
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Robert F. Poppiti, Jr. (No. 5052)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
rpoppiti@ycst.com

-and-

**DECHERT LLP**
Allan S. Brilliant (admitted *pro hac vice*)
Shmuel Vasser (admitted *pro hac vice*)
Stephen M. Wolpert (admitted *pro hac vice*)
Miles Taylor (admitted *pro hac vice*)
1095 Avenue of the Americas

14

New York, NY 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
shmuel.vasser@dechert.com
stephen.wolpert@dechert.com
miles.taylor@dechert.com

*Counsel to Ad Hoc Group of Secured Lenders*